# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

Kelsy Arlitz, et al.,

        Plaintiffs

  v.

GEICO Casualty Company,

        Defendant

Case No. 2:19-cv-00743-CDS-DJA

**Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, Denying Plaintiffs' Motion for Summary Judgment, and Granting Plaintiffs' Motion to Strike**

[ECF Nos. 111, 116, 185]

      The parties bring dueling motions for summary judgment concerning claims raised as part of an insurance dispute following a tragic car accident. Def.'s Mot. Summ. J., ECF No. 111; Pls.' Mot. Summ. J., ECF No. 116. The accident occurred on February 12, 2016, when nonparty William Richard Schulte, Sr. (Richard) crashed a vehicle owned by his son, nonparty William Christopher Schulte, Jr. (Christopher), into plaintiff Kelsy Arlitz, who was riding a motorcycle. ECF No. 116 at 11–12. Kelsy was catastrophically injured.

      Kelsy and her guardians, Gary and Karie Arlitz (the Arlitzes) sued the Schultes in state court for negligence. Accident Compl., ECF No. 116-24. Richard tendered the legal defense to his insurer, defendant GEICO Casualty Company, which denied that tender based on its position that it had no obligation to defend Richard under the policy because Richard and Christopher resided in the same household, which excluded Christopher's car from Richard's coverage. Pet. Removal, ECF No. 1 at 2. Facing immense liability, the Schultes negotiated an agreement with the Arlitzes whereby the Arlitzes agreed not to execute any judgment against the Schultes in exchange for the Schultes' rights and claims against GEICO. Am. Insurance Compl., ECF No. 1-2 at 12–13; Covenant, ECF No. 112-4 at 243–45. Following that negotiated agreement, the Arlitzes and Schultes entered into a binding arbitration after which the arbitrator awarded the Arlitzes

$65,749,540 plus interest. *Id.* at 12.

The Arlitzes, as assignees of Richard, pursue three causes of action against GEICO, including: (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, and (3) violation of Nevada's Unfair Claims Practices Act. *See generally* ECF No. 1. The Arlitzes argue that they are entitled to collect the full amount of the arbitration judgment from GEICO based on those breaches. ECF No. 1-1 at 19.

Now at summary judgment, the Arlitzes request that I find that GEICO breached its duty to make reasonable settlement decisions, that GEICO breached its duty of good faith and fair dealing by failing to inform the Schultes of Kelsy's settlement offer at GEICO's policy limits, that the Schultes were entitled to coverage under the GEICO policy when the collision occurred, that GEICO knowingly and unreasonably breached its contractual duty to defend the Schultes from the Arlitzes' accident lawsuit, and that the Arlitzes did not procure the arbitration judgment through fraud or collusion. *See generally* ECF No. 116.

GEICO requests that I find that it had no duty to defend the Schultes, that the arbitration judgment is not enforceable against GEICO, and that the Arlitzes' claims under Nevada's Unfair Claims Practices Act have no factual bases to survive summary judgment. *See generally* ECF No. 111.

I held two hearings on the competing summary judgment motions and ordered voluminous supplemental briefing on a variety of topics. Mot. Hr'g of June 22, 2022, ECF No. 162; Tr. of Hr'g, ECF No. 163; Mot. Hr'g of Aug. 15, 2022, ECF No. 178; Tr. of Hr'g, ECF No. 177; ECF Nos. 168–173 (first round of supplemental briefs); ECF Nos. 179–183 (second round of supplemental briefs). I instructed the parties to direct their second round of supplemental briefing toward summation of the evidence and arguments thus far. ECF No. 177 at 69. However, GEICO's summation brief references Richard's driver's license, which was not entered into evidence at any point during discovery. ECF No. 183 at 12. The Arlitzes now move to strike the reference to Richard's driver's license. ECF No. 185.

For the reasons described herein, I grant plaintiffs' motion to strike evidence of Richard's driver's license from GEICO's supplemental brief. I then deny plaintiffs' motion for summary judgment and grant in part and deny in part defendant's motion for summary judgment.

I.     **Relevant Background Information**

a.     *The Accident and Personal Injury Lawsuit*

On February 12, 2016, Richard drove his son Christopher's 2005 Ford automobile to a gas station. ECF No. 1-1 at 4. He admittedly operated the vehicle negligently, failing to look for oncoming traffic while pulling out from the gas station's driveway. *Id.* Consequently, he drove into the path of a motorcycle ridden by plaintiff Kelsy Arlitz, resulting in a crash. When the Ford struck the motorcycle, it ejected Kelsy, launching her to the ground. *Id.* Kelsy sustained significant brain injuries and has suffered severe and permanent loss of physical functions. *Id.* at 5.

At the time of the accident, Richard had personal auto liability insurance through GEICO with a policy limit for bodily injury claims of $15,000/person. *Id.* at 6. At all relevant times, Richard paid his premiums on time and fulfilled his contractual obligations and duties. *Id.* Mid-Century Insurance Company (also referred by the parties as "Farmers Insurance") covered the Ford, owned by Christopher, with a policy limit for bodily injury claims of $100,000/person. *Id.* Progressive Direct Insurance Company covered the motorcycle on which Kelsy was a passenger with a policy limit for bodily injury claims of $50,000/person. *Id.* Mid-Century and Progressive both settled with Kelsy at their policy limits in spring 2016. *Id.*

A few weeks after the collision, Richard contacted GEICO to open a claim. *Id.* at 7. The next day, the Arlitzes' counsel sent a letter of representation to GEICO requesting disclosure of GEICO's policy limits. *Id.* GEICO then sent Richard a letter denying coverage and liability for the collision on the basis that the Ford was not a vehicle covered under the policy. *Id.* at 8. Section I – Liability Coverages of the insurance contract between Richard and GEICO is excerpted in relevant part here:

4. *Insured* means a person or organization described under Persons insured;

5. *Non-owned auto* means an automobile. . . not owned by or furnished for the regular use of either *you* or a *relative*, other than a *temporary substitute auto* . . .

6. "*Owned auto*" means:

 (a) A vehicle described in this policy for which a premium charge is shown for these coverages;

 (b) A *trailer* owned by *you*;

 (c) A *private passenger*, *farm*, or *utility auto* which *you* acquire ownership of during the policy period . . .

 (d) A **Temporary Substitute auto.**

7. *Private passenger auto* means a four-wheel private passenger, station wagon or jeep-type auto.

8. *Relative* means a person related to *you* who resides in *your* household.

9. *Temporary substitute auto* means an automobile. . . not owned by *you*, temporarily used with the permission of the owner. This vehicle must be used as a substitute for the *owned auto* . . . when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction.

 . . .

13. *You* or *your* means the *named* insured as shown on the declarations page or, if a resident of the same household, his or her spouse or registered domestic partner. . .

ECF No. 113-2 at 6. The policy also has a section entitled "LOSSES WE WILL PAY FOR YOU UNDER SECTION I," which states:

Under Section I, we will pay damages which an *insured* becomes legally obligated to pay because of:

1. *Bodily Injury*, sustained by a person, and;

2. Damage to or destruction of property, arising out of the ownership, maintenance, or use of the *owned auto* or a *non-owned auto*. We will defend any suit for damages payable under the terms of this policy. We may investigate and settle any claim or suit.

*Id.* On May 25, 2016, counsel for the Arlitzes sent a letter to GEICO, offering to settle Kelsy Arlitz's claim against the Schultes for GEICO's $15,000 policy limit. ECF No. 116 at 23–24. GEICO never informed the Schultes of the offer or its consequences. *Id.* at 24.

4

Four months later, Kelsy Arlitz filed suit against the Schultes. ECF No. 116-24. GEICO continued to disclaim coverage and did not defend or aid the Schultes in that litigation. ECF No. 116 at 24. GEICO did so despite the provision in the insurance contract stating, "[GEICO] will defend any suit for damages payable under the terms of [the] policy." ECF No. 113-2 at 6. Whether the Arlitzes' accident lawsuit was a "suit for damages payable under the terms of [the] policy" is the main point of contestation in the instant suit. Ultimately, Christopher and his Ford (the car involved in the collision) were covered by Mid-Century, which had already agreed to pay the applicable policy limit of $100,000. Mid-Century's in-house attorney thus defended the Schultes. *Id.* at 25.

The Schultes, seeking to limit their financial exposure to the Arlitzes' claims, negotiated a covenant-not-to-execute which assigned their rights and claims against GEICO to the Arlitzes. *Id.* at 25. Kelsy's guardians, on her behalf, agreed to "not execute upon Schulte Defendants personally any award/verdict/judgment arising from the lawsuit above the $100,000.00 policy limits to be paid by [Mid-Century.]" Covenant Not to Execute, ECF No. 116-27 at 2. The Schultes and Arlitzes then entered binding arbitration conducted by an independent third-party to determine the amount of the damages suffered by Kelsy Arlitz. ECF No. 116 at 26. The arbitrator awarded Kelsy Arlitz $65,749,540.00. Arbitration Decision, ECF No. 116-3 at 4. Exactly $64,000,000 of the award was for "past and future pain and suffering," $1,710,935 was for "past medical specials," and $38,605 was for a "vehicle for transport." *Id.* On November 6, 2018, the district court entered its judgment upon the arbitration award. Notice of Entry of Judgment, ECF No. 116-28. The net effect of the Arlitzes' case against the Schultes insulated the Schultes from financial liability in exchange for assigning their claims against GEICO to the Arlitzes for GEICO's alleged failure to defend. While this litigation was underway, Richard passed away on January 21, 2020. Death Certificate, ECF No. 116-29.

b.   *The Instant Lawsuit*

Plaintiffs filed a complaint in state court alleging the following three causes of action:

(1) *Breach of contract.* Richard and GEICO were bound by the insurance contract, and the Arlitzes claim that GEICO's breach of its duty to defend Richard caused him to be exposed to a judgment over $65,000,000. ECF No. 1-1 at 15, ¶ 36.

(2) *Breach of covenant of good faith and fair dealing.* The Arlitzes claim that GEICO's conduct and willful refusal to perform the tasks to which it contracted with Richard violated its legal duty to deal with Richard fairly and in good faith. ECF No. 1-1 at 16, ¶ 41–43.

(3) *Violation of Nevada's Unfair Claims Practices Act, NRS 686A.310.* The Arlitzes claim that GEICO engaged in multiple unfair claims settlement practices, including violations of seven different subsections of the Act. ECF No. 1-1 at 17–19, ¶ 46–49.

GEICO removed the action to federal court. ECF No. 1. The parties conducted lengthy discovery and then filed competing summary judgment motions. *See, e.g.,* Pls'. Mot. for Partial Summ. J., ECF No. 21; Def's. Mot. for Summ. J., ECF No. 50. The court denied those motions without prejudice, explaining that the parties could refile them after the close of discovery. ECF No. 81. Discovery closed on March 1, 2021. ECF No. 108. The parties timely re-filed their motions for summary judgment, responses, and replies. *See generally* ECF No. 111 (defendant's MSJ), ECF No. 116 (plaintiffs' MSJ), ECF No. 131 (defendant's response to plaintiffs' MSJ), ECF No. 133 (plaintiffs' response to defendant's MSJ), ECF No. 138 (plaintiffs' reply to defendant's response), ECF No. 140 (defendant's reply to plaintiffs' response).

Next, plaintiffs sought leave to file supplemental authority about the applicability of a decision rendered by the Supreme Court of Nevada in October 2021. ECF No. 142. The court again denied all the pending motions without prejudice while the parties attempted mediation. ECF No. 154. Mediation was unsuccessful; the parties then submitted a joint motion to reset the hearing date and reconsider their competing motions for summary judgment. ECF No. 157. The case was administratively reassigned to me on May 17, 2022. ECF No. 158. I granted the motion to reset the hearing date and held an omnibus hearing on June 22, 2022. ECF No. 162.

Based on the complexity of the issues presented at that hearing, I granted plaintiffs' motion to file supplemental authority, ECF No. 142, and permitted further supplemental briefing on three topics: the coverage investigation and GEICO's disclaimer letters to the Schultes, GEICO's duty to defend the Schultes, and application (or non-application) of a California case, *Johansen v. California State Automobile Association Inter-Insurance Bureau*. ECF No. 163 at 53–54. I held a second hearing on August 15, 2022, to further clarify the issues. Hr'g Tr., ECF No. 177. At that hearing, I permitted the parties to file "closing argument" briefs. *Id.* at 69. Both sides did so. ECF Nos. 182, 183. Plaintiffs moved to strike part of GEICO's closing brief, noting that it contained evidence not previously produced during discovery. Mot. to Strike, ECF No. 185. I now rule on the pending motions for summary judgment and plaintiff's motion to strike.

## II.    Legal Standard

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the parties file simultaneous cross-motions for summary judgment on the same claims, "the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both

motions, before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (quoting *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Id.* at 250–51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24.

The moving party—the one seeking summary judgment—bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party satisfies Federal Rule of Civil Procedure 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. At summary judgment, "a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial." *Assur. Co. of Am. v. Ironshore Specialty Ins. Co.*, 2015 WL 4579983, at *3 (D. Nev. July 29, 2015) (citing *Anderson*, 477 U.S. at 249). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

### III.    Discussion

I first grant plaintiffs' motion to strike before addressing the motions for summary judgment. GEICO argues that it is entitled to summary judgment on all three claims brought by the Arlitzes, while the Arlitzes counter that they are entitled to summary judgment on their claims for breach of contract and violation of the covenant of good faith and fair dealing.

> a.    *Plaintiffs' Motion to Strike is Granted Because GEICO Was Not Permitted to Introduce New Evidence in its Supplemental Briefing*

As an initial matter, I grant plaintiffs' motion to strike the public record cited by GEICO regarding Richard's driver's license. At the conclusion of the August 15, 2022, hearing on the parties' motions for summary judgment, I stated that I would permit supplemental briefing of up to fifteen pages, which would serve as "closing argument." ECF No. 177 at 69. My request for a summation briefing did not include a request for the introduction of any new evidence.

"Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (internal alteration and citation omitted). Because the supplemental briefing effectively functioned as sur-replies to the other summary judgment briefing, I extend the reasoning from *Provenz* and note that it would be unfair to allow GEICO to introduce evidence for the first time without giving the plaintiffs an opportunity to respond or extending the same courtesy to plaintiffs.

As both sides agree, the relevant evidence for GEICO's coverage decision involved information that GEICO had at the time that coverage was disclaimed, not whatever evidence is adduced for the first time in supplemental briefing three years after that disclaimer. Accordingly, I do not consider Richard's driver's license in ruling on the motions for summary judgment. There is no suggestion in the record that GEICO relied upon or otherwise searched for Richard's driver's license information at the time that their coverage decision was made. The driver's license is unnecessary to resolving the summary judgment motions and constitutes new

evidence to which plaintiffs have not had the opportunity to respond. It should not be considered at summary judgment. Accordingly, Plaintiffs' motion to strike is granted.

   *b. Breach of Contract*[1]

   To succeed on their breach of contract claim, the Arlitzes must meet their burden of proving "a material failure of performance of a duty arising under or imposed by agreement." *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987). Nevada law treats insurance policies like other contracts, and thus, legal principles applicable to contracts generally are applicable to insurance policies. *Century Sur. Co. v. Andrew* (*Andrew*), 432 P.3d 180, 183 (Nev. 2018). "Whether a party has breached a contract and whether the breach is material are questions of fact." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 536 (9th Cir. 2011) (citing *Hoffman v. Eighth Jud. Dist. Ct.*, 523 P.2d 848, 850 (1974)); *see also Crowley v. Epicept Corp.*, 883 F.3d 739, 753 (9th Cir. 2018) ("Whether a breach is material is generally a question of fact for the jury.").

   Liability insurance policies "create a cascading hierarchy of duties between the insurer and the insured. At the top of this hierarchy are two general duties: the duty to defend and the duty to indemnify. The obligation of the insurer in the duty to indemnify is narrower than the insurer's duty to defend." *Allstate Ins. Co. v. Miller*, 212 P.3d 318, 324 (Nev. 2009) (citing *Crawford v. Weather Shield Mfg. Inc.*, 187 P.3d 424, 427 (Cal. 2008)). "The duty to defend is a valuable service paid for by the insured and one of the principal benefits of [a] liability insurance policy." *Andrew*, 432 P.3d at 183.

   The Arlitzes allege that GEICO breached the insurance policy by violating its duty to defend Richard from the personal injury lawsuit brought by the Arlitzes. ECF No. 1-2 at 16. GEICO seeks summary judgment on the basis that the policy did not require it to defend Richard because the vehicle he drove at the time of the collision, his son Christopher's 2005

---

[1] State law determines the court's interpretation of insurance policies and an insurer's duties to defend and indemnify. *Larson Constr. Co. v. Or. Auto. Ins. Co.*, 450 F.2d 1193, 1195 (9th Cir. 1971). I thus apply Nevada law.

Ford, was not covered under the policy. ECF No. 111 at 15–25. The Arlitzes seek summary judgment on the same claim based on their argument that a comparison of the terms of the policy and the complaint filed against Schultes in the personal injury action shows that GEICO undisputedly had a duty to defend Richard. ECF No. 116 at 42–44. Whether GEICO had a duty to defend Richard from the Arlitzes' personal injury lawsuit turns on material facts that the parties genuinely dispute—specifically, whether Richard and Christopher resided in the same household (i.e., lived together permanently or continuously). Thus, summary judgment is inappropriate on the breach-of-contract claim.

"Determining whether an insurer owes a duty to defend is achieved by comparing the allegations of the complaint with the terms of the insurance policy." *United Nat'l Ins. Co. v. Frontier Ins. Co.*, 99 P.3d 1153, 1158 (2004). "An insurer has no duty to defend only when 'there is no potential for coverage.'" *Allstate Prop. & Cas. Ins. Co. v. Yalda*, 2015 WL 1344517, at *3 (D. Nev. Mar. 20, 2015) (quoting *United Nat'l Ins. Co.*, 99 P.3d at 1158). "If there is any doubt about whether the duty to defend arises, this doubt must be resolved in favor of the insured." *United Nat'l Ins. Co.*, 99 P.3d at 1158. "The purpose behind construing the duty to defend so broadly is to prevent an insurer from evading its obligation to provide a defense for an insured **without at least investigating the facts behind the complaint**." *Id.* (emphasis added). Under Nevada law, "[t]he obligation of the insurer to defend its insured is purely contractual and a refusal to defend is considered a breach of contract." *Andrew*, 432 P.3d at 825. "The determination of the insurer's liability depends on the unique facts of each case and is one that is left to the jury's determination." *Id.* Furthermore, "even in the absence of bad faith, the insurer may be liable for a judgment that exceeds the policy limits if the judgment is consequential to the insurer's breach." *Id.* at 826.

Plaintiffs contend that the undisputed facts of this case establish that GEICO breached its contractual duty to defend Richard against the factual allegations in the personal injury lawsuit. ECF No. 116 at 34–38. They add that, as a direct and proximate result of the breach,

Richard was exposed to the arbitration judgment of $65,749,540.00 entered against him. ECF No. 1-2 at 16, ¶ 36.

GEICO argues that the policy did not obligate it to defend Richard because the car Richard was driving at the time of the accident, the 2005 Ford, was not covered by his GEICO policy. ECF No. 111 at 15–26; ECF No. 131 at 17–19. Furthermore, GEICO responds that its failure to defend Richard did not cause the excess judgment (*i.e.*, the amount of the arbitration award exceeding GEICO's policy limits) because the policy had an "other insurance" provision, which GEICO alleges absolved it from responsibility for the Schultes' defense. ECF No. 131 at 19–25. GEICO also contends that the arbitration award was unreasonable and procured through fraud or collusion. ECF No. 131 at 37–41.

Essentially, GEICO argues that it is entitled to summary judgment on the following three issues: (1) whether GEICO owed Richard a duty to defend him from the lawsuit brought by the Arlitzes; (2) if so, whether its breach of that duty was the proximate cause of the $65,749,540 arbitration award levied against Richard; and (3) regardless of the foregoing, whether the arbitration award was unreasonable or the product of fraud or collusion. *See generally* ECF No. 111. The existence of GEICO's duty to defend hinges on a disputed and material fact (whether the Schultes resided together); thus, the question of breach is inappropriate for resolution at the summary-judgment stage. Disputes of material fact also linger about whether the arbitration award was proximately caused by GEICO breaching its alleged duty to defend. Finally, the factual circumstances regarding the arbitration itself are also genuinely disputed. I therefore decline to grant summary judgment in either party's favor with respect to the breach-of-contract claim or the arbitration judgment.

1. *Whether GEICO Had a Duty to Defend Richard Hinges on a Genuine Dispute of Material Fact About Whether the 2005 Ford was a "Non-Owned Auto" Under the Policy*

When interpreting a provision of an insurance policy, the court's analysis must refer to the rest of the policy, which will "be read as a whole in order to give reasonable and harmonious meaning to the entire policy." *Siggelkow v. Phoenix Ins. Co.*, 846 P.2d 303, 304 (Nev. 1993). Insurance policies are to be broadly interpreted, doubts regarding coverage should be resolved in favor of the policyholder, and policies should be construed to achieve the policyholder's reasonable expectations. *Nautilus Ins. Co. v. Access Med., LLC*, 482 P.3d 683, 688 (Nev. 2021) (citing *United Nat'l Ins. Co.* 99 P.3d at 1158; *Powell v. Liberty Mut. Fire Ins. Co.*, 252 P.3d 668, 672 (Nev. 2011)). However, the insured (here, the Arlitzes in the Schultes' place) must establish coverage under an insurance policy, whether claiming a duty to indemnify or a duty to defend. *Zurich Am. Ins. Co. v. Ironshore Specialty Ins. Co.*, 497 P.3d 625, 630 (Nev. 2021) (en banc) (citing *Nat'l Auto. & Cas. Ins. Co. v. Havas*, 339 P.2d 767, 768 (Nev. 1959) (recognizing that the insured has the initial burden of proving that there is "a loss apparently within the terms of the policy"); *Turk v. TIG Ins. Co.*, 616 F. Supp. 2d 1044, 1050 (D. Nev. 2009) (recognizing that the insured bore "the initial burden of establishing the potential for coverage under" the insurance policies)).

Examination of the applicable policy language reveals that there exists a genuine dispute of material fact about whether GEICO had a duty to defend Richard against Plaintiffs' lawsuit. "[A]n insurer's duty to defend is triggered whenever the potential for indemnification arises, and it continues until this potential for indemnification ceases." *Benchmark Ins. Co. v. Sparks*, 254 P.3d 617, 622 (Nev. 2011). "Under most standard liability insurance policies, the insurer owes a duty to defend its policyholder against suits by third parties seeking damages covered by the policy." *Nautilus*, 482 P.3d at 685. "There is a potential for indemnification when the allegations in the third party's complaint show that there is arguable or possible coverage, or when the insurer ascertains facts which give rise to the potential of liability under the policy." *Id.* at 687–88

(internal quotations and citations omitted). "However, the duty to defend is not absolute." *United Nat'l Ins. Co.*, 99 P.3d at 1158. "If neither the allegations of the complaint nor the facts known to the insurer show **any possibility of coverage**, then there is no duty to defend. In such a case, the insurance policy simply does not apply." *Nautilus*, 482 P.3d at 688 (emphasis added). In sum, "[w]here there is potential coverage based on 'comparing the allegations of the complaint with the terms of the policy,' an insurer does have a duty to defend." *Andrew*, 432 P.3d at 184 n.4 (quoting *United Nat'l Ins.*, 120 Nev. at 687). Furthermore, "facts outside the complaint cannot justify an insurer's refusal to defend its insured." *Id.*

Thus, GEICO should have determined if it had a duty to defend Richard from liability for his negligent operation of the vehicle based on the facts contained within the four corners of the complaint. The complaint filed by the Arlitzes against the Schultes alleged that: (1) Richard negligently operated a Ford owned by Christopher and caused the collision that resulted in injuries to Kelsy Arlitz and (2) Christopher gave Richard permission to drive the vehicle. Accident Compl., ECF No. 116-24. GEICO policy no. 4379-21-44-57, issued to Richard, was undisputedly in effect at the time of the accident. ECF No. 131 at 2 (citing the policy, ECF No. 113-2 at 1–27). I therefore analyze whether GEICO had a duty to defend Richard from the Arlitzes' lawsuit by comparing the allegations of the personal injury complaint against the language of GEICO's policy.

Section I of the policy states that GEICO will "pay damages which an insured becomes legally obligated to pay because of bodily injury sustained by a person, and . . . arising out of the ownership, maintenance, or use of the **owned auto** or a **non-owned auto**. [GEICO] will defend any suit for damages payable under the terms of this policy." ECF No. 113-2 at 6. None of the relevant exclusions listed later in the policy apply. *Id.* at 7. Neither party disputes that Kelsy was a person who sustained bodily injury and that her injuries arose out of Richard's use of the 2005 Ford. Neither party disputes that the vehicle was not an "owned auto." But they disagree about whether the 2005 Ford qualified as a "non-owned auto." *Compare* ECF No. 111 at 16–18 *with* ECF

No. 116 at 33.[2]

The insurance policy states that a "**non-owned** auto means an automobile or trailer not owned by or furnished for the regular use of either you or a relative, other than a temporary substitute auto. An auto rented or leased for more than 30 days will be considered as furnished for regular use." ECF No. 113-2 at 6. The Ford was not owned or furnished for Richard's regular use. ECF No. 116 at 33–34. Christopher confirmed this at a deposition. ECF No. 116-2 at 103:11–104:4. The Ford was, however, owned by Christopher for *his* regular use. *See* ECF No. 116 at 2 ("Richard drove **Christopher's vehicle** when the collision occurred.").

Because the vehicle was owned by Christopher or furnished for his regular use, it would qualify as a non-owned auto only if Christopher was not considered a relative of Richard as defined by the GEICO policy. This is the crux of the dispute and where the parties' views diverge. The policy defines "relative" as "a person related to you who **resides** in your **household**." ECF No. 113-2 at 6 (emphasis added). "You" and "your" refer to the named policyholder (*i.e.*, Richard). *Id.* Put simply, the policy requires the Schultes (1) to be related and (2) to reside in the same household to be considered "relatives." Thus, if Christopher were a person related to Richard, who also resided in Richard's household, then the Ford would have been owned by a relative, therefore disqualifying it as a non-owned auto. Neither party disputes that Christopher was "a person related to" Richard. The narrow issue in contention is whether they *resided* together in the same *household*. Neither of the terms "resides" or "household" are defined by the policy. *See generally id.*

---

[2] Plaintiffs argue that GEICO failed to investigate whether the Ford qualified as a "temporary substitute auto" under the policy. ECF No. 116 at 32. While the Ford would be an "owned auto" if it were a temporary substitute auto, plaintiffs at no point express the opinion or cite evidence that coverage should be premised on the temporary substitute auto definition. For the Ford to qualify as a temporary substitute auto, plaintiffs are required to demonstrate that Richard's car was "withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction." ECF No. 113-2 at 6. They do not allege that Richard's car was ever withdrawn from normal use and therefore there is no evidence that the Ford was a "temporary substitute auto." Consequently, the dispositive issue in this case is whether the Ford was a "non-owned auto."

Scrutinizing the specific language of the insurance policy is appropriate in this case, as "[c]lauses providing coverage are broadly interpreted 'so as to afford the greatest possible coverage to the insured[.]'" *Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614, 616 (Nev. 2014) (quoting *Nat'l Union Fire Ins. Co. of the State of Pa., Inc., v. Reno's Exec. Air, Inc.*, 682 P.2d 1380, 1383 (Nev. 1984)). Because the policy is silent on some of its most crucial language, I must view the terms of the contract "in their plain, ordinary and popular sense." *Casino W., Inc.*, 329 P.3d at 616.

To ascertain the "ordinary and popular" meaning of terms, courts in Nevada often refer to dictionary definitions. *See, e.g., MGM Mirage v. Nev. Ins. Guar. Ass'n*, 125 Nev. 223, 231 n.6 (2009) (using dictionary definitions to determine the "common lay and legal understanding of [a] term" in an insurance policy). Looking to the dictionary, the word household is defined as "a family living together," or "a group of people who dwell under the same roof." *Household*, *Black's Law Dictionary* (11th ed. 2019). I rely on Black's definition of "household" and apply it to GEICO's use of "household" in Richard's insurance policy, which I find imputes onto the policy a requirement of "living together" or "dwell[ing] under the same roof." Furthermore, the word "reside" is defined, "to dwell **permanently** or **continuously**: occupy a place as one's legal domicile." *Reside*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/reside (last visited Nov. 9, 2022) (emphasis added).[3] The language used in GEICO's policy only defines relative as "a person who resides in your household" but does not define "reside" or "household." These words have ordinary and popular definitions that suggest permanence or continuity, concepts that

---

[3] This definition was not cherrypicked; modern legal dictionaries, including the most recent editions of Black's Law Dictionary and Ballantine's, do not define "reside." Black's last defined "reside" in its sixth edition by way of reference to how two non-precedential cases from different states defined the term at the time. *See reside, Black's Law Dictionary* (6th ed. 1991). The most relevant binding authority in Nevada states that "[t]he word 'resided' in its general acceptation carries with it **the idea of permanency as well as continuity**." *Vaile v. Eighth Jud. Dist. Ct.*, 44 P.3d 506, 511 (Nev. 2002), *abrogated on other grounds by Senjab v. Alhulaibi*, 497 P.3d 618 (Nev. 2021) (quoting *Fleming v. Fleming*, 134 P. 445, 447 (Nev. 1913)) (emphasis added). Because Nevada's statutes, judicial authority, modern legal dictionaries, and—most importantly—the insurance policy at issue are all silent on the definition of 'reside,' I thus define the term by reference to Webster's Dictionary, a definition which "carries with it the idea of permanency as well as continuity." *Vaile*, 44 P.3d at 511.

GEICO failed to investigate in determining whether Christopher's auto was covered by Richard's insurance policy.

Plaintiffs argue that Richard was a transient individual who stayed temporarily with his son, used Christopher's address as a "PO box," and regularly stayed elsewhere. ECF No. 116 at 34. Specifically, Plaintiffs allege that when Richard stayed at Christopher's house, "the arrangement was always intended to be temporary, not permanent." *Id.* They add that Richard would often leave the house and stay elsewhere at Christopher's request. *Id.*

Christopher stated, under oath via affidavit, that his father began staying at his house "on a temporary basis" around the beginning of 2012. ECF No. 116–20 at 2. He adds that between 2012 and 2017, Richard "stayed at [his] residence . . . every other week and for a few days at a time[,]" that Richard "always understood that his stay at [Christopher's address] was intended to only be temporary and never permanent[,]" and that Richard "never kept all of his personal belongings inside [Christopher's] residence . . . during his infrequent stays[.]" *Id.* at 2–3.

GEICO contends that its own investigation "made . . . absolutely clear that Christopher was Richard's son, and that they were residing together at the time of the accident." ECF No. 111 at 18. GEICO argues that "the Schultes . . . each separately confirmed in both recorded statements and follow-up interviews [that they] lived in the same household . . . in Las Vegas, [at] the same address listed in the GEICO policy and police report." ECF No. 131 at 1.

However, this disagreement represents a genuine dispute about whether the Schultes indeed resided together, especially considering the Arlitzes' allegation that GEICO did not ascertain the relevant facts when making its coverage determination. *See* ECF No. 133 at 5–6 (arguing that the coverage disclaimer was predicated on a factually inadequate coverage investigation). GEICO's insurance adjuster, Jeremy Rains—who was assigned to perform the coverage investigation—stated that it was "correct" that he "didn't have any details" about how long Richard was at Christopher's house, how frequently he stayed there, whether he received mail there, whether his personal belongings were there, whether he ever stayed elsewhere, or

1   whether his residence was permanent or temporary. Jeremy Rains Dep., ECF No. 116-10 at
2   113:18–25. Plaintiffs argue that Rains failed to properly investigate whether coverage was
3   appropriate at the time that the Arlitzes filed their personal injury complaint. ECF No. 116 at 17–
4   20. They note that while Rains asked whether Richard lived with Christopher, he did not ask
5   any other questions to determine the precise nature of their living relationship. ECF No. 116 at
6   19:24–20:10 (citing Rains Dep., ECF No. 116-10 at 138:24–139:12). Plaintiffs add that Rains failed
7   to follow up on this issue over a series of further interviews during GEICO's coverage
8   investigation. ECF No. 116 at 20–21. GEICO responds by arguing that Rains' investigation was
9   "reasonably objective and thorough" because he conducted two interviews of Richard. ECF No.
10  131 at 2–3, 9.

11          Because GEICO's own coverage investigator did not know whether Richard's
12  arrangement with Christopher was "permanent or temporary," GEICO should not have been so
13  hasty to disclaim coverage. Because the parties disagree about whether Richard and Christopher
14  were in fact "living together" or "dwell[ed] under the same roof," this genuine dispute of material
15  fact precludes me from deciding whether the Schultes were, in fact, "relatives" as defined by the
16  policy. Furthermore, under Nevada law, "[n]umerous cases support the obvious premise that the
17  intent of the parties is one of the relevant factors to be considered in determining whether, for
18  the purposes of insurance coverage, people reside in a common household." *United Servs. Auto.*
19  *Ass'n v. Akers*, 729 P.2d 495, 496 (Nev. 1986) (citations omitted). Plaintiffs allege that, at the time
20  of the accident, "Richard lived sporadically with Christopher and expressed no intent to live
21  there permanently." ECF No. 116 at 42:5–6. GEICO responds that "[t]he lack of any expressed
22  intent of [Richard] to reside permanently at [Christopher's] address is equally meaningless, as
23  there is no evidence of his expressed intent to not do so or of any intent to live elsewhere." ECF
24  No. 131 at 16:4–6. GEICO's assertion that both sides' positions are "equally meaningless" does
25  not weigh in favor of granting summary judgment to one party over the other. Because insurance
26  policies are to be broadly interpreted, and doubts regarding coverage should be resolved in favor

of the policyholder (*Nautilus Ins. Co.*, 482 P.3d at 688), I should resolve the doubts as to whether Richard and Christopher intended to reside together in favor of the policyholder, *i.e.*, Richard, without explicit information contradicting that conclusion. That is because the Nevada Supreme Court instructs that "[i]f there is any doubt about whether the duty to defend arises, this doubt must be resolved in favor of the insured." *United Nat'l Ins. Co*, 99 P.3d at 1158. "The purpose behind construing the duty to defend so broadly is to prevent an insurer from evading its obligation to provide a defense for an insured without at least investigating the facts behind the complaint." *Id.*

The Arlitzes have presented sufficient evidence to suggest that a jury could find that GEICO engaged in the type of business practice that the Nevada Supreme Court warned against: it attempted to evade its obligation to defend Richard without first sufficiently investigating whether Richard and his son intended to reside together. There is some evidence supporting that the two lived together, but that evidence cannot dispel the genuine dispute over whether their arrangement was permanent or continuous. There is also evidence, even if raised after-the-fact, suggesting they did not reside together permanently.[4] The conflicting evidence raises credibility determinations and weight of the evidence questions that should be left to a

---

[4] Christopher's affidavit, stating Richard lived with him only temporarily (ECF No. 116–20 at 2-3), was taken on September 11, 2020. His deposition, stating that Richard did not live with him permanently (ECF No. 116-2 at 102:3–7), was taken in February 2021. Both sources of evidence were taken long after the filing of the Arlitzes complaint, after the Schultes and Arlitzes agreed on the covenant-not-to-execute, and after GEICO's coverage disclaimer. Thus, Christopher's and Richard's answers regarding the Schultes' living situation at the time of the accident give rise to credibility determinations. However, Christopher—a non-party to the dispute between the Arlitzes and GEICO and insulated from any liability due to the covenant—was sworn under penalty of perjury in both instances.

Regardless, at summary judgment, "the judge does not weigh disputed evidence with respect to a disputed material fact. Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005) (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) (internal citations omitted)); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 n.5 (9th Cir. 2004) ("[I]t is axiomatic that disputes about material facts and credibility determinations must be resolved at trial, not on summary judgment.").

jury for resolution. Consequently, I find that there exists a genuine dispute of material fact about whether Christopher was a person who resided in Richard's household.

The lack of information uncovered by GEICO's investigation—together with the Schultes' deposition testimonies—has created an ambiguity about whether Richard and Christopher were "relatives" for coverage purposes. The resolution of that ambiguity directly affects whether GEICO had a duty to defend. This question is recognized by GEICO's own legal counsel, whose assessment was that the allegations in the personal injury complaint "could potentially trigger the duty to defend." ECF No. 116 at 43 (citing Vedder Dep., ECF No. 116-9 at 146:11–21).

Consequently, the frequency with which Richard resided at Christopher's house, the nature of their living arrangement, and other pertinent facts demonstrate that there remains a genuine dispute of material fact as to whether the Schultes indeed resided in the same household and were therefore "relatives" as defined by Richard's GEICO policy. Whether they did or did not is a factual determination for the jury to make, as "it is axiomatic that disputes about material facts and credibility determinations must be resolved at trial, not on summary judgment." *McGinest*, 360 F.3d at 1113 n.5. For this reason, I deny Plaintiffs' and Defendant's motions for summary judgment on the breach-of-contract claim.

> 2. *The Parties Genuinely Dispute Whether the Alleged Breach Caused the Excess Judgment*

In addition to arguing they did not breach their duty to defend, GEICO's motion for summary judgment also argues that even if there was a breach, that breach was not the proximate cause of the $65,749,540 arbitration award levied against Richard. "An insurer that refuses to tender a defense 'for its insured takes the risk not only that it may eventually be forced to pay the insured's legal expenses but also that it may end up having to pay for a loss that it did not insure against.'" *Andrew*, 432 P.3d at 186 (quoting *Hamlin Inc. v. Hartford Accident & Indem. Co.*, 86 F.3d 93, 94 (7th Cir. 1996)). Indeed, Nevada rejects the argument that, as a matter of law,

"damages in excess of the policy limits can never be recovered as a consequence to an insurer's breach of its duty to defend." *Id.* at 186 n.5. Accordingly, "the insurer refuses to defend at its own peril." *Id.* at 186.

However, it is not true that an entire judgment is automatically a consequence of an insurer's breach of its duty to defend; "rather, the insured is tasked with showing that the breach caused the excess judgment and 'is obligated to take all reasonable means to protect himself and mitigate his damages.'" *Id.* (quoting *Thomas v. W. World Ins. Co.*, 343 So. 2d 1298, 1303 (Fla. Dist. Ct. App. 1977)); *see also Conner v. S. Nev. Paving, Inc.*, 741 P.2d 800, 801 (Nev. 1987) ("As a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts."). GEICO is thus liable for excess damages that the insured (in this case, the insured's assignees) can demonstrate were caused by its breach. GEICO is not liable for any damages that the insured failed to take reasonable means to mitigate.

Determinations of good or bad faith on the part of an insurance company in breach of its duty to defend do not necessarily impact the amount recoverable. *See Andrew*, 432 P.3d at 186 ("[W]e conclude that an insured may recover any damages consequential to the insurer's breach of its duty to defend. As a result, an insurer's liability for the breach of the duty to defend is not capped at the policy limits, even in the absence of bad faith."). That said, when an insurer refuses to defend its insured, the insured "may, without forfeiture of his right to indemnify, settle with the [injured party] upon the best terms possible, taking a covenant not to execute." *Century Sur. Co.*, 134 F. Supp. 3d at 1265 (quoting *Samson v. Transamerica Inc.*, 636 P.2d 32 (Cal. 1981)) (collecting other cases). In this context, the covenant not to execute "is not a release which would permit the insurer to escape its obligations." *Id.* (internal quotation omitted). Consequently, an insurer is bound by its insured's settlement (and any resulting judgment) so long as the settlement and judgment are reasonable and not collusive or fraudulent. *Id.* (citing *Pruyn v. Agric. Ins. Co.*, 36 Cal. App. 4th 500, 515 (Cal. Ct. App. 1995)). I address the reasonableness, collusiveness, and fraud arguments *infra* subsections three and four. But first, I

1  discuss GEICO's argument that it is not responsible for any excess judgment because Mid-

2  Century provided a defense to the Arlitzes.

3        GEICO first alleges that the "other insurance" provision in Richard's policy "makes any

4  coverage afforded by the GEICO policy excess to the coverage afforded by the Mid-Century

5  policy." ECF No. 111 at 27. It adds that "non-owned auto 'excess only' language is common and

6  applies to make the non-owned auto liability coverage excess and non-contributory in relation

7  to the vehicle owner's primary liability coverage, regardless of the terms of that policy's 'Other

8  Insurance' clause[.]" *Id.* at 27 n.15. GEICO concludes, without citation to authority, that

9  "[w]here a policy affords coverage that is excess to a separate policy affording primary coverage,

10 the insurer which affords only excess coverage has no duty to defend."[5] *Id.* GEICO's position is

11 untenable under Nevada law.

12       The Supreme Court of Nevada has "concluded that 'an insurance company could not seek

13 to "defer or limit its liability" on the basis of the availability of other insurance.'" *Alamo Rent-A-*

14 *Car, Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 P.2d 1074, 1076 (Nev. 1998) (quoting *Yosemite Ins. V. State*

15 *Farm Mut.*, 653 P.2d 149, 150 (Nev. 1982)). Furthermore, GEICO has not proven the applicability

16 of the "other insurance" clause because it has not demonstrated that, even if it is an excess

17

18 _____

   [5] GEICO cites *Admiral Insurance Company v. Illinois Union Insurance Company*, 2010 WL 11579447 (D. Nev. May
19 24, 2010) for the proposition that excess insurers have no duty to participate in the insured's defense
   until the primary coverage is exhausted. ECF No. 111 at 27. However, GEICO's reliance on *Admiral* is
20 misplaced as that case is neither binding nor particularly persuasive. *Admiral* analyzes the liability of an
   excess insurer by looking to California law. S*ee Admiral* 2010 WL 11579947, at *3 (stating that the court
21 may "turn to California law for guidance" and analyzing cases applying California law in reaching the
   proposition for which GEICO cites the case). The Nevada Supreme Court subsequently rejected
22 California's approach to the duty to defend when it decided *Andrew* in 2018. *See Andrew*, 432 P.3d at 184–85
   (rejecting the majority view, which included Californian law, in deciding liability of an insurer that
23 breaches its duty to defend). Furthermore, *Admiral* involves an insurance policy that contained a self-
   insured retention policy which required an insured to pay an amount of loss before the insurer was
24 required pay for the loss beyond that amount. 2010 WL 11579447, at *4. The facts in *Admiral* required that
   court to determine: (1) whether the insurer on a policy containing a self-insured retention policy is an
25 excess or a primary insurer, and after finding that it is an excess insurer, and (2) whether it had a duty to
   defend the insured prior to the self-insured retention policy taking effect. *Id. Admiral* does not apply to the
26 present case.

insurer, it is not liable for any damages incurred by the Schultes. The "other insurance" clause states in its entirety:

> If the *insured* has other insurance against a loss covered by Section I of this policy, we will not owe more than our pro-rata share of the total coverage available.
>
> Any insurance we provide for losses arising out of the ownership, maintenance[,] or use of a vehicle *you* do not own shall be excess over other valid and collectible insurance.

ECF No. 113-2 at 8. Even if the second paragraph of the "other insurance" clause applies and GEICO's loss qualifies as "excess," GEICO provides no Nevada authority for its argument that, as an excess insurer, the arbitration judgment cannot be levied against it. At best, under the terms of GEICO's own policy, it has some argument as to what the "pro-rata share" of the arbitration award GEICO might "not owe more than." *Id.* However, GEICO has not analyzed its own "other insurance" policy against Mid-Century's "other insurance" policy or formulated argument as to whether that pro-rata share might apply. It must do so to even assert the validity of its own "other insurance" provision. *See Yosemite*, 653 P.2d at 150 ("We declare[] such 'other insurance' clauses to be void where . . . they conflict with similar clauses in the other policy of insurance." (citing *Travelers v. Lopez*, 567 P.2d 471 (Nev. 1977))). Consequently, I decline to grant summary judgment because of the "other insurance" provision.

Second, GEICO argues that, because Richard was defended by Mid-Century, any failure on GEICO's part "cannot have caused any damage to the Schultes as a matter of law." ECF No. 111 at 28. I agree with GEICO's position that plaintiffs bear the ultimate burden at trial of demonstrating that GEICO's alleged breach of its duty to defend caused the arbitration judgment. *See Andrew*, 432 P.3d at 186 ("[W]e conclude that an insured may recover any damages **consequential to the insurer's breach** of its duty to defend." (emphasis added)). Nonetheless, GEICO fails to allege the existence of undisputed material facts demonstrating that the breach did not cause the arbitration judgment.

GEICO undermines its own argument when it discusses Mid-Century's defense of the Schultes. Plaintiffs aptly identify the tension between (1) GEICO's argument that Mid-Century

provided a defense to the Schultes, thus immunizing GEICO from any excess judgment levied against the Schultes, and (2) GEICO's argument that Mid-Century "abdicated any defense" of the Schultes, ECF No. 111 at 33, thus giving rise to collusion at the arbitration. ECF No. 182 at 15–16. While plaintiffs do not contend that GEICO should be precluded from pursuing both positions simultaneously, GEICO's argument that Mid-Century failed to properly defend the Schultes complicates its attempt to disprove causation between its alleged breach of the duty to defend and the arbitration judgment. Put another way, both of GEICO's arguments rely on different interpretations of whether Mid-Century, in fact, defended the Schultes from the Arlitzes' personal injury lawsuit: on one hand, GEICO argues that the excess judgment resulted from Mid-Century abdicating its defense of the Schultes, while on the other hand, GEICO argues that the excess judgment cannot be enforced against it because Mid-Century defended the Schultes. Specifically, GEICO argues that "there were potentially viable liability and damages defenses [that Mid-Century's counsel] chose not to assert" in defense of the Schultes. ECF No. 111 at 33. GEICO concludes that Mid-Century failed to assert these defenses for "only one possible reason: [Mid-Century's counsel and the Schultes] were simply indifferent to the difference between a $65 million and a $6.5 million award." *Id.* at 34. GEICO adds that it "is egregious . . . that [Mid-Century's counsel] did not even attempt to investigate" those defenses. *Id.* at 35. GEICO also alleges that Mid-Century's counsel allowed counsel for the Arlitzes "to seek future pain and suffering damages—the vast majority of the award—on the basis of a presentation that was per se improper under Nevada law." *Id.* at 36. GEICO concludes that Mid-Century's counsel "did not simply fail to present a defense at the arbitration; she allowed her silence. . . to place an imprimatur of legality to a clearly objectionable factual and legal presentation." *Id.* at 37.

GEICO's argument that the arbitration judgment did not stem from its breach of its duty to defend the Schultes, paired with its extensive criticism of Mid-Century's defense of the Schultes, strains credulity. Stated otherwise, GEICO alleges that Mid-Century's defense was

somehow both incompetent enough to yield the arbitration award and competent enough to have provided to the Schultes the same defense that GEICO would have provided—such that GEICO's alleged breach of its duty to defend was harmless. *Compare* ECF No. 111 at 29 (GEICO states that the Schultes "were at all times defended by Mid-Century" so "any breach [of the duty to defend] could not have caused the Schultes any damages") *with* ECF No. 111 at 32–33 (GEICO states that Upson and Mid-Century "abdicated any defense" of the Schultes).

If GEICO had provided the Schultes with a defense, it may have presented the arguments or made the objections that Mid-Century's counsel did not. The arbitration award may have differed. These concerns—the extent to which Mid-Century's counsel defended the Schultes, the exact nature of the arbitration proceedings, and the extent to which Mid-Century solely defending the Schultes cost the Schultes more than a hypothetical defense led by GEICO—lie beyond the province of summary judgment. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007) (stating that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.")

Finally, in support of its proximate-causation argument, GEICO overextends nonbinding authority. *See* ECF No. 183 at 2–3 (quoting and relying on a footnote from *Ghilotti Bros. v. Am. Safety Indemn. Co.*, 493 F. App'x 860, 861 n.2 (9th Cir. 2012)). While *Ghilotti Bros.* states that "[a]n insurer's refusal to defend is of no consequence to an insured whose representation is provided by another insurer," it is an unpublished memorandum disposition analyzing the duty to defend under California law as it relates to the standing of the plaintiffs in bringing a lawsuit against an excess insurer. *See Ghilotti Bros.*, 493 F. App'x at 861 n.2 (internal quotation omitted). The *Ghilotti Bros.* footnote, and the California cases to which it cites, support generally the idea that, under California law, an insured is not entitled to two full defenses when one insurer offers the "expertise and resources . . . in making prompt and competent investigations as to the merits of lawsuits filed against their insured[.]" *Id.* The issue with applying that reasoning to this case is that GEICO, by its own arguments, cannot demonstrate that Mid-Century indeed provided the

full extent of its expertise and resources or a competent investigation as to the merits of the Arlitzes' lawsuit against the Schultes. GEICO's conclusion, that "[b]ecause another insurer provided a defense . . . [the Arlitzes] cannot rely on that alleged breach to seek . . . the vast excess judgment rendered against the Schultes" (ECF No. 183 at 5), creates a rule more stringent than the standard under Nevada law. GEICO fails to demonstrate the lack of a genuine dispute of material fact as to whether the Schultes were provided a full defense by Mid-Century, and further, GEICO fails to demonstrate that there are no genuine disputes of material fact related to its alleged breach of its duty to defend the Schultes or whether that breach affected the arbitration judgment.

Ultimately, whether the arbitration award is recoverable by the Arlitzes is a jury question that depends on what damages were found to flow from GEICO's alleged breach of its contractual duty to defend, which must be determined first. *See Andrew*, 432 P.3d at 186 ("The determination of the insurer's liability depends on the unique facts of each case and is one that is left to the jury's determination." (citing *Khan v. Landmark Am. Ins. Co.*, 757 S.E.2d 151, 155 (Ga. Ct. App. 2014) ("[W]hether the full amount of the judgment was recoverable was a jury question that depended upon what damages were found to flow from the breach of the contractual duty to defend.")). With no reason to grant summary judgment on whether the breach caused the arbitration judgment, I now turn to the validity of the arbitration judgment itself.

> 3.  *Whether the Arbitration Judgment Was Reasonable is a Genuine Dispute of*
> *Material Fact*

GEICO argues that the arbitration judgment levied against the Schultes was both unreasonable and fraudulent or collusive. ECF No. 111 at 32–39. It argues that the arbitration judgment was "clearly unreasonable" because "the pain and suffering award suffered from fatal flaws under Nevada law which make it unenforceable," because Mid-Century, as counsel for the Schultes, allegedly failed to develop a defense theory, and because the amount of the $65,649,540 award is too high. *Id.* at 38. GEICO's first two arguments simply recapitulate its contentions

about fraud or collusion, which I address *infra*. GEICO's third argument is supported not by law but by a declaration from one of its attorneys. *See id.* at 38 (citing Decl. of Matthew P. Bunting, ECF No. 114). In that declaration, GEICO's counsel purports to have conducted a survey of thirty-three traumatic-brain-injury verdicts and settlements in Nevada. ECF No. 114 at 2. The attorney attempts to distinguish amongst the facts of the present action and those in other instances involving million-dollar or multimillion-dollar verdicts for pain and suffering or settlement awards. *Id.* at 3–4.

Plaintiffs respond that Mid-Century's litigation strategy was reasonable and that the arbitration award was also reasonable. ECF No. 133 at 24–25. They add that the arbitrator "fully realized the magnitude of Kelsy's injures once she observed [Kelsy] throughout the arbitration," which "formed the basis for [the arbitrator] to understand how the lives of [the Arlitzes] completely revolve around taking care of Kelsy." *Id.* at 28. They describe the arbitration judgment as supported by competent evidence that cannot be undermined simply by the duration of the proceeding. Finally, plaintiffs contend that GEICO's counsel's declaration (ECF No. 114) is inadmissible for two reasons: (1) because it was produced after the close of discovery and (2) because it constitutes impermissible expert testimony.[6] *Id.* at 30. They add that the declaration fails to recite law in support of its contentions and that GEICO fails to present evidence capable of challenging the award sufficient to meet the exacting standards of summary judgment. *Id.* at 30–31.

The arbitration award at issue equals $65,649,540. ECF No. 116-3 at 4. Exactly $64,000,000 of that award was for compensatory pain and suffering. *Id.* GEICO, neither in its motion for summary judgment nor in the Bunting declaration, cites to any law about what makes an arbitration award reasonable or unreasonable. The standard cited to by the Arlitzes for evaluating punitive damages in Nevada ("A damage award is not excessive if it does not

---

[6] GEICO fails to reply to the Arlitzes' assertion that the Bunting declaration constitutes inadmissible evidence. *See generally* ECF No. 140.

shock [the judiciary's] conscience" (ECF No. 133 at 31)), also does not apply here, as the

arbitrator did not award punitive damages. GEICO's suggestion that the arbitration award was

unreasonable rests only on its conclusory allegation that Kelsy's pain and suffering is not worth

$64,000,000 because such an amount would be the highest-ever award in Nevada for pain and

suffering. ECF No. 111 at 38. The Arlitzes state that "Kelsy was only 19 years old when she

suffered her severe traumatic injury along with several other severe physical injuries . . . Kelsy

lost part of her brain matter from the collision and to date, is still unable to speak." ECF No. 133

at 31. The arbitrator herself concluded that "there is no amount of money that will fix Kelsy's

brain or her injuries." ECF No. 116-3 at 3. Under Nevada law, "the elements of pain and suffering

are wholly subjective," and "because of their very nature, a determination of their monetary

compensation falls peculiarly within the province of the jury[.]" *Stackiewicz v. Nissan Motor Corp. in

U.S.A.*, 686 P.2d 925, 932 (Nev. 1984). It is true that there must be a sufficient evidentiary basis to

support the desired amount of pain and suffering damages. *Wyeth v. Rowatt*, 244 P.3d 765, 782

(Nev. 2010). However, there is insufficient evidence in the record for me to overturn the

arbitrator's determination of Kelsy Arlitz's pain and suffering at summary judgment. While

counsel for GEICO submitted an affidavit in support of its argument that the judgment is

unreasonable, I need more than an affidavit discussing unrelated cases and unknown similarities

or dissimilarities to this case, to determine if the amount awarded to Kelsy is in fact,

unreasonable.

   Next, I address GEICO's argument that the pain and suffering portion of the arbitration

award was "secured in direct violation of at least two Nevada rules," each of which could be

grounds for a reversal if the pain and suffering damages were awarded through a state district

court verdict. ECF No. 111 at 19–20. GEICO does not cite legal authority for its argument that an

arbitration award is unreasonable if it would be overturned upon review in some hypothetical

situation wherein the case proceeded through state court. *See generally id.* It does, however,

provide authority stating that an award which is legally or factually untenable may result in the

elimination of damages allocated toward that award, but fails to demonstrate that the arbitration award is, in fact, legally or factually untenable. ECF No. 111 at 38–39. GEICO's argument is somewhat circular in this respect—it alleges that the award is unreasonable because of its size (over $65 million) and that its size is itself per se evidence of unreasonableness, without citation to authority for either of those propositions. GEICO does allege that Mid-Century's counsel failed to assert specific arguments in the Schultes defense, but that allegation does not bear on what evidence the arbitrator *did* consider when rendering her judgment. Put simply, my careful examination of the record and of the arbitrator's decision, ECF No. 116-3, does not indicate the legal and/or evidentiary bases upon which the arbitrator made her decision. GEICO itself provides neither an evidentiary basis nor a legal authority to support its conclusion that the arbitration award is unreasonable. I thus decline to grant summary judgment in either party's favor as to the award's reasonableness.

> ### 4. Whether the Arbitration Judgment Was Procured Through Fraud or Collusion is a Genuine Dispute of Material Fact

As a threshold matter, GEICO bears the burden of demonstrating the existence of fraud or collusion, as it was the insurer that failed to tender a defense of its insured. *See Century Sur. Co.*, 134 F. Supp. 3d at 1268 (collecting cases for the proposition that "the insurer who breached its duty to defend bears the burden of showing by a preponderance of the evidence that the agreement was fraudulent or collusive"). This case does not involve a settlement between the Arlitzes and Schultes, but rather a judgment procured as the result of binding arbitration. Neither side cites to binding authority, and I can find none, applying the fraud or collusion doctrines to an arbitration award rather than a negotiated settlement agreement. Nonetheless, the parties seem to agree that standards regarding fraud and collusion in the settlement context also apply here. *See, e.g.*, ECF Nos. 111, 133. Having thoroughly reviewed the applicable case law, I agree and analyze the arbitration award under this framework.[7]

---

[7] Although I note that an arbitration like the one in question, conducted by a third-party arbitrator, is more insulated from the possibility of fraud or collusion than a settlement agreement between two

"It is not fraudulent or collusive for the insured to assign its rights against its insurer and to receive a covenant not to execute in return." *Century Sur. Co.*, 134 F. Supp. 3d at 1267. By executing such an agreement, "the insured 'attempt[s] only to shield himself from the danger to which [his insurer] exposed him.'" *Id.* (quoting *Samson*, 636 P.2d at 32). But an insurer is not bound by "those trial proceedings which are clearly a patent sham collusively designed to create a judgment for which liability insurance coverage would then exist." *Id.* (quoting *Pruyn*, 36 Cal. App. 4th at 517 n.16). While the Nevada Supreme Court has yet to address what constitutes fraud or collusion in the arbitration context, "other courts have indicated that fraud and collusion occur 'when the purpose is to injure the interests of an absent or nonparticipating party, such as an insurer or nonsettling defendant.'" *Id.* (quoting *Cent. Mut. Ins. Co. v. Tracy's Treasures, Inc.*, 19 N.E.3d 1100, 1120 (Ill. App. Ct. 2014)). Nonetheless, "generally what may constitute fraud or collusion is a fact-intensive inquiry determined on a case-by-case basis." *Id.* (citing *Andrade v. Jennings*, 54 Cal. App. 4th 307, 327 (Cal. Ct. App. 1997)). I find the reasoning utilized by other courts addressing this topic to be persuasive and adopt it here. Factors that those courts consider include whether: the arbitration award was unreasonable, it involved any misrepresentation or concealment of material facts, there was a lack of arms-length negotiation, there were attempts to affect the insurance coverage or to artificially increase damages flowing from the insurer's breach of the duty to defend, and there was profit to the insured. *See Century Sur. Co.*, 134 F. Supp. 3d at 1268 (discussing fraud or collusion in the context of settlements rather than arbitration agreements); *Tracy's Treasures*, 19 N.E.3d at 1120 (same).

GEICO alleges that the plaintiffs and the Schultes engaged in a collusive arbitration with the knowledge that the Schultes, based on the covenant not to execute and assignment of the Schultes' claims to the Arlitzes, seemingly had nothing to lose while the Arlitzes had everything to gain. ECF No. 111 at 8–14. GEICO alleges that counsel for Mid-Century, the company that

---

negotiating parties, by virtue of the decision being made by the independent neutral party rather than the parties who could otherwise be incentivized to defraud or collude as part of a settlement.

insured Christopher and the 2005 Ford,[8] gave an inadequate defense at the arbitration because Mid-Century was aware of the covenant not to execute on the Schultes. *Id.* Specifically, GEICO argues that counsel and the Schultes did virtually no investigation of any defense, consulted no experts, conducted no discovery, agreed to hold a secret arbitration, never told the arbitrator about the covenant not to execute, offered no evidence or defense at the arbitration, agreed in advance to stipulate to the award in the arbitration, and allowed without objection arguments impermissible under Nevada law. ECF No. 140 at 14.

The Arlitzes respond that the arbitration was not collusive, contending that Mid-Century raised valid defenses available to the Schultes, briefed the issues extensively before meeting with the arbitrator, and never discussed the value range of any potential judgment with counsel for the Arlitzes prior to arbitration. *Id.* at 26–29. Plaintiffs assert that the arbitration itself was properly conducted by a retired Nevada state district court judge who worked for a neutral third party as an arbitrator for years. *Id.* at 24–25.

GEICO's allegations that the arbitration was held "in secret" and that the arbitrator was not informed about the covenant not to execute are unsupported by the record. GEICO cites "Hansard Dec. ¶¶ 15, Ex. M, MCCURRY 27" for the proposition that Mid-Century's counsel agreed to a "secret arbitration that [Mid-Century] would pay for, at which defendants would waive liability." ECF No. 111 at 11. GEICO's citation refers to a series of emails between the Arlitzes and Schultes' counsel regarding the date on which the arbitration would be held. *See generally* Upson/Coleman e-mails, ECF No. 112-4 at 237–40. The only thing conceivably "secret[ive]" about those emails is the generic attorney/client privilege disclaimer, which many lawyers use, in counsel's email signature. *See id.* ("Please Note This E-Mail/telefax message and any documents accompanying this transmission may contain privileged and/or confidential information and is intended solely for the addressee(s) named above. . . ."). None of the emails

---

[8] Mid-Century was solely responsible for the Schultes' defense at the arbitration because by the time it occurred, GEICO had already denied coverage.

come close to describing a clandestine arbitration or hidden location; in fact, Upson (Mid-Century's counsel representing the Schultes) states that "[i]f the parties do not have an agreement, [the Schultes] will be sending the case out." *Id.* at 239. The email exchange reads more adversarial than conspiratorial or collusive.

GEICO's second allegation that Upson and the Schultes, "having secured a covenant not to execute, acted with . . . indifference to the amount of any award" is also unsupported by the record. ECF No. 116 at 15. It asserts that Christopher "didn't really care" what the arbitration award against him and his father would be. *Id.*; ECF No. 111 at 12. However, Christopher was not the lawyer responsible for Richard's legal defense. GEICO has not demonstrated that Upson or Mid-Century acted with indifference to the amount of the arbitration award; Christopher's deposition statement reveals nothing about Mid-Century's defense at the arbitration hearing.

In totality, GEICO raises reasonable arguments that the arbitration award could have differed had Mid-Century defended the Schultes from the Arlitzes' accident lawsuit the way that GEICO, with the power of hindsight, suggests Mid-Century should have. But an insurer "which has wrongfully abandoned its insured . . . not only had a right to participate in and control the litigation, it had a duty to do so. An insurer which has wrongfully abandoned its insured should not be heard to complain or allowed to relitigate the trial court's judgment merely because the default or uncontested proceedings followed, and were related to, an agreement between the insured and the claimant." *Andrade*, 54 Cal. App. 4th at 324 n.10. In the absence of genuinely undisputed facts demonstrating that Mid-Century and the Arlitzes colluded to render judgment against GEICO, summary judgment is inappropriate with respect to the arbitration award. My determination comports with courts' caution that allegations of fraud or collusion in the context of settling insurance claims are generally issues to be determined by a finder of fact. *See Century Sur. Co.*, 134 F. Supp. 3d at 1268 (collecting cases stating that whether a settlement agreement was fraudulent or collusive is an issue of fact). Viewing the facts in the light most favorable to the Arlitzes, a reasonable jury could find the arbitration was

not fraudulent or collusive. Because genuine disputes remain over material issues of fact about whether the arbitration was a product of fraud or collusion, a jury must decide that issue, and I decline to grant summary judgment on it.

> ### c.  Breach of the Covenant of Good Faith and Fair Dealing

The law, not any insurance contract, imposes the covenant of good faith and fair dealing on insurers. *Miller*, 212 P.3d at 324 (citing *U.S. Fidelity & Guar. Co. v. Peterson*, 540 P.2d 1070, 1071 (1975)). Nevada law provides a cause of action for breach of the implied covenant of good faith and fair dealing when benefits owed under an insurance policy are unreasonably withheld. *See Peterson*, 540 P.2d at 1070 ("Where an insurer fails to deal fairly and in good faith with its insured by refusing without proper cause to compensate its insured for a loss covered by the policy[,] such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing."). Breach of this covenant may be referred to as "bad faith," defined as "an actual or implied awareness of the absence of a reasonable basis for denying benefits of the [insurance] policy." *Miller*, 212 P.3d at 324 (quoting *Am. Excess Ins. Co. v. MGM*, 729 P.2d 1352, 1354–55 (Nev. 1986)).

The Arlitzes base their bad faith claim on GEICO's alleged failure to fulfill two primary duties owed to the Schultes. First, the Arlitzes assert that GEICO's decision not to defend Richard from the personal injury lawsuit was made in bad faith. ECF No. 116 at 48, ¶ 4. Second, they assert that GEICO's decision not to inform the Schultes of various elements of the lawsuit (including the Arlitzes' offer to settle the personal injury lawsuit within GEICO's policy limits and the Schultes' potential exposure to a judgment that exceeds the policy limits) constitutes a breach of the covenant of good faith and fair dealing. *Id.* at ¶ 2. GEICO responds that it did not breach either of its duties to settle or to inform the Schultes. ECF No. 131 at 20. GEICO contends that because it did not clearly have a duty to defend, the duties cascading from the duty to defend could not have been breached in bad faith. *Id.* Because GEICO's duty to defend was not and has not yet been clearly established, I agree that bad faith has not been established.

Nevada law provides that "a primary insurer's exercise of its right and duty to defend includes settlement duties . . . and a duty to adequately inform the insured of settlement offers." *Miller*, 212 P.3d at 322. Furthermore, while "an insurer must settle claims promptly, fairly, and equitably once its liability becomes reasonably clear," *Cromer v. Bristol W. Ins. Grp.*, 2015 WL 4611934, at *1 (Nev. July 31, 2015) (table), GEICO's liability and its duty to defend in this case is anything but "reasonably clear." As discussed *supra*, I find a genuine dispute of material facts as to whether Christopher's Ford was a "non-owned auto" under the policy. "When there is genuine dispute regarding an insurer's legal obligations, the district court can determine if the insurer's actions were reasonable." *Miller*, 212 P.3d at 330.

Given the facts that GEICO had at the time it disclaimed coverage for Richard, a reasonable person could decide either way as to whether the vehicle Richard was driving at the time of the accident constituted a "non-owned auto" under the policy. GEICO alleges that at that time, and based on their own statements, Richard and Christopher lived together. ECF No. 111 at 6. The addresses that they provided on the Traffic Accident Report matched; both listed the same address as the one Richard gave to GEICO for his policy information. *Id.* Thus, GEICO did not act in bad faith when it disclaimed coverage on the information that it had at the time.

The Arlitzes have not provided the court with evidence supporting a contrary determination. Plaintiffs' arguments focus on the question of breach but are devoid of details about whether GEICO acted unreasonably when it denied coverage. Consequently, plaintiffs did not meet their burden in demonstrating that GEICO breached its duties downstream of the duty to defend, whether to settle or to inform, in bad faith. Plaintiffs do raise colorable arguments that GEICO's rejection of the Arlitzes' demand to settle at the policy's limits was "grossly unreasonable because GEICO failed to give any consideration to the financial interests" of the Schultes, which therefore constituted bad faith. ECF No. 116 at 30. But they cite no law stating that an insurer acts in bad faith when it fails to consider the insured's financial situation while determining if it has a duty to provide coverage. As a result, I grant GEICO summary judgment

on this claim.

       d.   *Violations of Nevada's Unfair Claims Practices Act, NRS § 686A.310*

NRS § 686A.310 "designates certain insurance company activities to be unfair practices and by implication permits a private right of action by an insured against an insurer for violation of the statute." *Williams v. Am. Fam. Mut. Ins. Co.*, 2012 WL 1574825, at *4 (D. Nev. May 2, 2012) (citing *Hart v. Prudential Prop. & Cas. Ins. Co.*, 848 F. Supp. 900, 903 (D. Nev. 1994)). "The protections of NRS 686A.310 are broader than the tort of bad faith and extend to the processing of the claim." *Id.*

Plaintiffs assert that GEICO violated numerous subsections of the Nevada Unfair Claims Practices Act, including: NRS § 686A.310(1)(a), for misrepresenting the insurance policy when it said Richard was not covered under the policy for the subject claim; NRS § 686A.310(1)(b) for failing to act reasonably promptly upon communications or providing a legitimate basis in denying coverage; NRS § 686A.310(1)(c) for failing to adopt and implement reasonable standards for the prompt investigation and processing of Richard's claim; NRS § 686A.310(1)(e) for failing to effectuate a prompt, fair, and equitable settlement after GEICO's liability had become reasonably clear; NRS § 686A.310(1)(f) for compelling the Schultes to commence litigation to recover amounts due under the policy by offering substantially less than the amounts ultimately recovered; NRS § 686A.310(1)(g) for attempting to settle the Arlitzes' claim for less than an amount to which a reasonable person would have believed she was entitled; and NRS § 686A.310(1)(n) for failing to provide a reasonable explanation for its refusal to settle the Arlitzes' claim. ECF No. 1-2 at 18–20.

The Arlitzes do not seek summary judgment on its claims under the Nevada Unfair Claims Practices Act. *See generally* ECF No. 116. But GEICO seeks summary judgment on all seven subclaims. ECF No. 111 at 39–40. GEICO asserts that its position that Richard was not covered by the policy and subsequent communication of its position to Richard serves to defeat the plaintiffs' claims brought under NRS §§ 686.A310(a), (b), (c), (e), (f), and (n). *Id.* GEICO adds

that there was no attempt to settle the Arlitzes' personal injury lawsuit and thus NRS § 686.A310(g) does not apply at all. *Id.* at 40.

The Arlitzes do not directly respond to GEICO's arguments but, rather indirectly by way of a footnote, contend that their responsive arguments to the motion for summary judgment on the first two causes of action also apply to the third cause of action. *See* Pl's Resp. to Def's Mot. for Summ. J., ECF No. 133 at 10 n.2 (stating that "[a]ll of the facts and arguments set forth below" in response to GEICO's requests for summary judgment on the breach and covenant of good faith and fair dealing claims "also defeat GEICO's request for dispositive relief regarding plaintiffs' claim that GEICO violated Nevada's Unfair Claims Practices Act").

Because I find that a genuine dispute of material fact precludes me from determining whether GEICO had a duty to defend Richard, I first grant GEICO's motion for summary judgment on the Arlitzes' claims under NRS § 686.A310(a). The statute prohibits "[m]isrepresenting to insureds or claimants pertinent facts or insurance policy provisions relating to any coverage at issue." NRS § 686.A310(a).  GEICO did not misrepresent to the Schultes any pertinent fact(s) or insurance policy provision(s). GEICO instead gave its interpretation that accords with one potential view of the policy.

Second, I grant GEICO summary judgment on the claim under NRS § 686.A310(b), as plaintiffs do not contest that "GEICO promptly and repeatedly explained to [the Schultes]" (ECF No. 111 at 39) why GEICO believed there was no basis for coverage under the policy. The statute prohibits "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies." NRS § 686.A310(b). Because plaintiffs fail to contest that GEICO acknowledged and acted reasonably promptly upon receiving communications from the Schultes, there is no genuine dispute of material fact that would permit this claim to survive summary judgment.

Third, I deny GEICO summary judgment on the claim under NRS § 686.A310(c), as there are several genuine disputes of material fact as to whether GEICO adopted and implemented reasonable standards for the prompt investigation and processing of claims arising under the insurance policy. The statute prohibits "[f]ailing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies." NRS § 686.A310(c). While GEICO promptly decided that Christopher's vehicle was a "non-owned auto," plaintiffs extensively detail the alleged deficiencies in GEICO's investigation and claim processing mechanisms in making that determination. *See* ECF No. 116 at 35–41. Specifically, the Arlitzes assert that insurance adjuster Jeremy Rains was improperly trained (*id.* at 35), that Rains failed to follow internal procedure for informing the Schultes (*id.* at 36), that Rains performed a factually incomplete coverage investigation (*id.* at 38–39), and that GEICO's own claims legal counsel Martin Vedder approved the coverage disclaimer without a reasonable factual basis (*id.* at 40–41). GEICO responds that its investigation and coverage disclaimer were all proper. ECF No. 131 at 7–15. While each of these sub-issues should be fact-specific inquiries, GEICO has failed to present undisputed facts that preclude a genuine dispute over those sub-issues. *See* ECF No. 111 at 39:21–25. Summary judgment is therefore inappropriate at this stage of litigation.

Fourth, I grant GEICO's motion for summary judgment as to the claim under NRS § 686.A310(e), because as previously noted, GEICO's liability under the policy was at no point, including now, "reasonably clear." The statute prohibits "[f]ailing to effectuate prompt, fair[,] and equitable settlements of claims in which liability of the insurer has become reasonably clear." NRS § 686.A310(e). The genuine dispute of material fact over GEICO's duty to defend the Schultes precludes a determination of GEICO's liability under the policy.

Fifth, I deny GEICO's motion for summary judgment on the claim under NRS § 686.A310(f), because GEICO has not demonstrated the absence of genuine dispute of material fact as to whether it compelled the Arlitzes to initiate this litigation. The statute classifies it as

an unfair practice when an insurer "compel[s] insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered." NRS § 686.A310(f). There is a $65,749,540 gap between what GEICO offered ($0) and what the Arlitzes ultimately recovered via arbitration ($65,749,540). Another judge in this district has construed the "ultimately recovered" language in the statute to refer to amounts recovered following arbitration. *See Young v. Mercury Cas. Co.*, 2016 WL 4083217, at *7 (D. Nev. July 29, 2016) (granting a plaintiff summary judgment on an NRS § 686.A310(f) claim because an insurer offered zero dollars to a plaintiff who ultimately received $250,000, the full amount of the policy limit, in arbitration). I reach no determination on the application of the "ultimately recovered" language in this order because I find a genuine dispute of material fact as to whether the Arlitzes, as assignees of the Schultes, were "compelled" to institute this litigation. The dispute is intertwined with GEICO's decision to decline coverage for Richard and reliance on Mid-Century's "defense" at the time of the arbitration.

Sixth, I grant GEICO's motion for summary judgment as to NRS § 686.A310(g). The statute prohibits "[a]ttemping to settle a claim by an insured for less than the amount to which a reasonable person would have believed [they were] entitled by reference to written or printed advertising material accompanying or made part of an application." NRS § 686.A310(g). Plaintiffs' complaint fails to allege any written or printed advertising material accompanying or made as part of an application. Plaintiffs did not provide this court with any evidence or cite any such material or application in evidence. With no evidence before me to suggest that GEICO could have violated the statute, I grant GEICO summary judgment on plaintiffs' claim under NRS § 686.A310(g).

Seventh, I deny GEICO's motion for summary judgment as to the claim under NRS § 686.A310(n), as GEICO fails to demonstrate an absence of genuine dispute of material fact. The statute describes an unfair practice when an insurer "fail[s] to provide promptly to an insured a reasonable explanation of the basis in the insurance policy, with respect to the facts of the insured's claim and the applicable law, for the denial of the claim . . ." NRS § 686.A310(n). GEICO's explanation to the Schultes for denying coverage was scant with information. *See generally* Mar. 16 Letters, ECF No. 116-18 at 2–5. The letters disclaiming coverage contain a generic template stating that GEICO "disclaims any and all physical damage coverage and liability coverage for the 2005 Ford . . . under the policy . . . issued to William Richard Schulte." *Id.* at 2, 4. GEICO based its disclaimer on the statement that "the 2005 Ford . . . does not meet the definition of an owned auto per the policy contract." *Id.* It then cut and pasted a large chunk of the underlying insurance policy into the disclaimer, thus providing Richard with no additional information by which he could discern why the 2005 Ford did not qualify as an "owned auto." *Id.* The coverage disclaimer letters contain no information regarding the applicable law, nor do they relate the specific facts of Richard's claim to the policy itself. At the very least, a reasonable explanation of the basis for denial would be expected to contain *some* indication as to how GEICO concluded that the 2005 Ford failed to fit into the categories of vehicle covered under Richard's policy.

GEICO argues that it "repeatedly explained to [the Schultes] that the vehicle in question did not qualify as an "owned" or a "non-owned" auto. ECF No. 111 at 40:15–17. GEICO does not argue *how* it repeatedly explained that the Ford did not qualify and does not cite to any specific language in any communication to the Schultes that supports its argument. *Id.* Instead, GEICO cites to the declaration of its own claims supervisor, Christopher Tevez.[9] *See id.* That declaration is unavailing; it merely summarizes the same cut-and-paste policy language sent to Richard back

---

[9] GEICO filed two declarations drafted by Tevez in this case. ECF Nos. 113, 132. I refer only to the first Tevez declaration, ECF No. 113, as the latter has no bearing on this issue.

in 2016. *See generally* Tevez Decl., ECF No. 113. In fact, the letters that Tevez references and append to his declaration, which were all sent from GEICO to the Schultes or counsel, are even more bereft of explanatory information than the letter discussed *supra*. *See* Mar. 10 Letter, ECF No. 113-2 at 77–78 (stating that the investigation was underway); Mar. 16 Letter, ECF No. 113-2 at 80–81 (same letter as the March 16 letter discussed *supra*); Mar. 17 Letter, ECF No. 113-2 at 83 (stating that the "denial is being made because [the] policy does not cover the vehicle involved" with no further explanation); Mar. 17 Letter, ECF No. 113-2 at 85 (stating that GEICO would take no further action on the claim with no explanation); May 26 Letter, ECF No. 113-2 at 93 (stating that GEICO is "unable to provide coverage for this loss" without further explanation); Nov. 23 Letter, ECF No. 113-3 at 22–23 (same generic policy description as the March 16 letter but with different formatting).

GEICO seems firmly convinced of its position that it "repeatedly explained" to the Schultes that the vehicle in question was not an "owned" or a "non-owned" auto. But GEICO's repeat so-called explanations are the same form letter sent five times across eight months. The only specific details contained in any of the letters are the names of the parties, the policy number of the insurance contract, and the type of vehicle in question. *See generally* Coverage Letters, ECF No. 113-2 at 22–23, 77–78, 80–81, 83, 85, 93. The insurance policy is cut and pasted into a couple of the letters and formatted to look like the actual policy in only the final November 23 letter. Not one of the letters describes *why* the 2005 Ford did not qualify as either an "owned" or a "non-owned" auto, nor do any purport to identify any law or facts that "provide[s] promptly to an insured a reasonable explanation of the basis in the insurance policy, **with respect to the facts of the insured's claim and the applicable law**, for the denial of the claim[.]" NRS § 686.A310(n) (emphasis added). GEICO cites nothing other than the inadequate Tevez declaration in support of its motion. I thus deny GEICO summary judgment on this claim.

IV.     Conclusion

IT IS HEREBY ORDERED that plaintiffs' motion for summary judgment **(ECF No. 116) is DENIED**.

IT IS FURTHER ORDERED that defendant's motion for summary judgment **(ECF No. 111) is GRANTED in part and DENIED in part**. I grant GEICO summary judgment on plaintiffs' claim for breach of the covenant of good faith and fair dealing, as well as on plaintiffs' claims for relief under NRS 686.A310(a), (b), (e) and (g) only. I deny GEICO summary judgment on plaintiffs' claim for breach of contract and on plaintiffs' claims for relief under NRS § 686.A310 (c), (f), and (n).

IT IS FURTHER ORDERED that plaintiffs' motion to strike (ECF No. 185) is **GRANTED**.

DATED: November 22, 2022

_____
Cristina D. Silva
United States District Judge